FILED

2021 Sep-29  AM 09:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **HEATHER LOPER, on behalf of herself and all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 2:19-CV-583-CLM** |
| **LIFEGUARD AMBULANCE SERVICE, LLC,** | ) ) ) | |
| **Defendant.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Heather Loper brought a class action against Lifeguard Ambulance Service, LLC, to challenge Lifeguard's alleged practice of billing certain ambulance passengers excessive rates without contracting for or otherwise disclosing the price Lifeguard would charge for its services. Lifeguard seeks summary judgment on Loper's individual claims. (Doc. 51). And Lifeguard asks the Court to strike and disregard evidence of certain forms of monetary harm that Loper claims she suffered as a result of Lifeguard's billing practices. (Doc. 74). In sum, the Court grants in part and denies in part Lifeguard's motion for summary judgment, and the Court grants in part and denies in part Lifeguard's motion to strike and disregard.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court draws the facts from the summary-judgment record. At this stage of the litigation, "[a]ll evidence and factual inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021).

## I.    Factual Background of Loper's Claims

### A. Ordering the Transport

In March 2017, Loper was a patient at Thomas Hospital in Fairhope, Alabama. (Docs. 55 ¶ 1, 61 ¶ 1). After a few days in the hospital, Loper's doctor decided to transfer her either to UAB Hospital in Birmingham or Vanderbilt Hospital in Nashville, whichever had the first available bed, to obtain more effective treatment. (Docs. 55 ¶ 2, 61 ¶ 2). Loper's doctor contacted both hospitals on her behalf. (*Id.*).

Several days later—on Saturday, March 11—Vanderbilt Hospital informed Loper's doctor that it had an available bed. (Docs. 55 ¶ 3, 61 ¶ 3). But Loper had only 24 hours to make it to Nashville, 458 miles away. (Docs. 55 ¶ 3, 61 ¶ 3, 67-2 at 256). Otherwise, Loper would lose the bed. (Docs. 55 ¶ 3, 61 ¶ 3).

Loper's husband, Murray, handled her communications because Loper "was under extreme pain and under severe medication." (Docs. 55 ¶ 4, 61 ¶ 4, 67-3 at 30).

When Loper's doctor told Murray that Vanderbilt Hospital had an open bed (Docs. 55 ¶ 3–4, 61 ¶ 3–4), Murray authorized Thomas Hospital to arrange for a ground ambulance to take Loper to Vanderbilt Hospital (Doc. 67-3 at 26). The same day, Thomas Hospital contacted Lifeguard about providing an ambulance transport. (Docs. 55 ¶ 6, 61 ¶ 6). And the hospital directed Lifeguard to deliver Loper by no later than Sunday, March 12, which was the next day. (Docs. 55 ¶ 12, 61 ¶ 12).

### B. Disclosing the Cost

Two of Lifeguard's policies need explanation. First, Lifeguard's billing structure. For uninsured passengers and privately insured passengers, like Loper, Lifeguard calculates its price based on a formula that reflects: (1) whether the transport is emergent or non-emergent; (2) the level of care that ambulance technicians provide during the trip (there are four levels); and (3) the transport distance multiplied by a per-mile rate. (Docs. 55 ¶ 9, 61 ¶ 9).

Second, Lifeguard's "Out-of-Town Transport Policy." Lifeguard usually investigates a passenger's insurance coverage before conducting any non-emergency transport that exceeds 100 miles. (Docs. 55 ¶ 7, 61 ¶ 7). And if the passenger lacks coverage for any portion of the estimated bill, Lifeguard prepares a written quote showing the amount it plans to charge, the passenger's insurance coverage, and how much that the passenger will have to pay personally. (*Id.*). The

policy itself says to "[p]rovide [a] quote for expected charges the [passenger] will incur." (Doc. 62-2 at 250). After doing so, Lifeguard obtains a written, pre-transport commitment from the passenger that he or she will pay the amount not covered by insurance. (Docs. 55 ¶ 7, 61 ¶ 7).

Lifeguard knew that Loper had health insurance through BlueCross and BlueShield of Alabama. (Docs. 55 ¶ 11, 61 ¶ 11). But because this story began on Saturday and concluded on Sunday, Lifeguard was unable to determine the amount of coverage BlueCross would provide and thus didn't know whether BlueCross would pay for all, some, or none of the transport. (*Id.*).

So Lifeguard didn't make a pre-transport disclosure of the estimated cost. (Docs. 55 ¶ 14, 61 ¶ 14). Lifeguard says that it didn't for three reasons. First, it had no way to know the scope of Loper's coverage. (Doc. 55 ¶ 12). Second, it had no chance to discuss the cost with Loper or Murray because the hospital coordinated the pick-up. (Doc. 55 ¶ 14). And third, neither Loper nor Murray asked about the cost. (*Id.*). Still, even though Lifeguard says it had no way or chance to make a complete pre-transport disclosure of the amount Loper would have to pay herself, its corporate representative testified in his deposition that Lifeguard could have made a limited disclosure based on available information. (Doc. 67-2 at 91).

Loper and Murray believed that BlueCross would cover the entire cost. In his deposition, Murray vaguely recalled a Thomas Hospital representative saying that BlueCross would cover the transport. (Doc. 67-3 at 28, 31). And Loper and Murray each recalled an on-site Lifeguard representative saying that insurance would cover the trip. (Docs. 67-3 at 43, 67-4 at 10).

### C. Billing the transport

Lifeguard picked up Loper on Sunday morning and delivered her to Vanderbilt Hospital around 5:00 PM that afternoon. (Docs. 55 ¶ 13, 61 ¶ 13, 67-2 at 256). Near the end of the transport, at 4:45 PM, Loper signed an agreement ("Acknowledgment Form") stating:

> The person signing below . . . assigns to Supplier all rights to (and related or associated with) any benefits claims and/or payments due from any third-party payor as reimbursement or payment for the Services . . . [and] agrees that the patient is financially responsible for, and obligated to pay, the amount charged by Supplier for the medical services, including any amount that is not paid by any third-party payor.

(Docs. 55 ¶ 15, 61 ¶ 15, 67-2 at 242). But the form did not set out the amount that Lifeguard would charge. (Docs. 67-2 at 67, 242–43).

Lifeguard submitted an $8,166.11 bill to BlueCross. (Docs. 55 ¶ 16, 61 ¶ 16). That amount represented Lifeguard's base charge of $590.79 for a non-emergency basic-life-support transport and a mileage charge of $7,575.32 (458 miles at $16.54

per mile). (Doc. 55 ¶ 10, 16; Doc. 61 ¶ 10, 16). Lifeguard calculated the total using its commercial rates for uninsured and privately insured passengers. (Docs. 55 ¶ 17, 61 ¶ 17, 67-2 at 116–17). But the parties dispute whether those align with "market" rates. (Docs. 55 ¶ 18, 61 ¶ 18).

BlueCross paid $3,889.96 to Lifeguard. (Docs 55 ¶ 19, 61 ¶ 19, 67-3 at 88–89). That amount represented Loper's $4,862.45 in coverage minus Loper's 20% deductible. (*Id.*). BlueCross then sent a notice to Murray that explained the amount it paid and that Loper still owed $4,276.15 to Lifeguard—*i.e.*, the sum of her deductible and the balance of the charge. (*Id.*). In April 2017, Lifeguard sent an invoice to Loper for $4,276.15. (Doc. 67-3 at 91). Then, in August 2017, Lifeguard referred the debt to a collection agency. (Doc. 61 ¶ 22; Doc. 67-4 at 16, 49).

So Loper hired an attorney. In December 2017, Loper's counsel sent a letter to Lifeguard expressing that no written contract existed, that Loper did not consent to charges beyond what BlueCross paid, and that Lifeguard's rates were unreasonable. (Doc. 67-4 at 73–74). Loper made several demands, including "[c]ease and desist any attempts at collection," and she threatened to sue. (*Id.*).

In her October 2020 deposition, Loper testified that she began paying "around $20 or $30 a month" for a credit-monitoring service because of the collection effort. (Doc. 67-4 at 22, 37). But Lifeguard has not reported Loper's debt to any credit

agencies and her credit has not suffered. Nor has Lifeguard pursued collection efforts since December 2017. (Docs. 55 ¶ 22, 61 ¶ 22, 71 ¶ 22). Indeed, Loper testified that she "never heard another word" about the debt after her counsel sent the December 7th letter. (Doc. 67-4 at 49).

## II.   Procedural Background

Loper filed her complaint in the Circuit Court of Jefferson County, Alabama. (Doc. 1-1). Lifeguard removed it to this federal court under the Class Action Fairness Act. *See* 28 U.S.C. § 1332(d)(2). After removal, the Court denied Loper's requests to voluntarily dismiss and to remand to state court. (Doc. 31).

Loper then filed an amended complaint with claims for declaratory judgment (seeking declaratory and injunctive relief), fraudulent suppression, negligent misrepresentation, and breach of contract. (Doc. 43-1). Her amended complaint seeks these declarations:

a. "that Defendant and Plaintiff and the Class did not enter into any express written contract for Plaintiff and the Class to pay the prices charged by the Defendant for the transportation services it provided";

b. "that Defendant and Plaintiff and the Class did not enter into any express oral contract for Plaintiff and the Class to pay the prices charged by the Defendant for the transportation services it provided";

c. "that the law implies a contract between the Defendant and Plaintiff and Plaintiff [C]lass whereby the Defendant rendered services and in return is to receive a reasonable value for its services";

   d. "that Defendant charged Plaintiff and the Class rates in excess of reasonable charges as required by state law";

   e. "that Defendant ha[s] no legally enforceable right to charge and/or collect the prices charged in any court proceeding or other collection effort, and Plaintiff and the Class have no legal obligation to pay Defendant the prices charged by Defendant for the transportation of patients"; and

   f. "that Defendant charges prices that are excessive and unsupportable by market rates."

(Doc. 43-1 at 14–15). Loper also asks for an injunction ordering Lifeguard to stop "charging excessive rates for the transporting of patients without an express agreement" and to quit its "attempts to collect outstanding bills representative of excessive rates for which no express agreement as to price exists." (*Id.* at 15). She also requests "disgorgement" of funds wrongfully collected. (*Id.* at 15, 19).

      Lifeguard filed a motion for summary judgment on Loper's claims. (Doc. 51). Foreseeing a different ending, Loper filed a motion (and corrected motion) for class certification. (Docs. 53, 54). She asks to proceed on behalf of:

      All individuals with private health insurance and/or uninsureds who, within the applicable statute of limitations under their respective state's law, have been charged in excess of reasonable market rates by Defendant for medical transport services from a location within the United States without an express contract to pay specific mileage and other amounts charged.

(Doc. 54 at 1). Lifeguard opposes class certification. (Doc. 64).

## DISCUSSION

The Court divides its discussion section into two main parts. First, the Court addresses Lifeguard's motion to strike and disregard. (Doc. 74). Second, it analyzes whether Lifeguard is entitled to summary judgment. (Doc. 51).

## I.     Lifeguard's Motion to Strike and Disregard

After briefing and a hearing on Lifeguard's summary judgment motion, Loper presented two documents contending that Lifeguard's actions harmed her in three ways: (1) unlawfully billing her; (2) forcing her to incur the cost of a credit-monitoring service; and (3) forcing her to hire counsel to fight Lifeguard's collection effort. (Docs. 74-1 at 3, 78-1 at 1). Lifeguard asks the Court to strike those filings and to disregard those damages allegations because Loper introduced them "for the first time in response to Lifeguard's motion for summary judgment." (Doc. 74 at 5). That request is granted in part and denied in part.

We begin with the disclosure and supplementation requirements of the Federal Rules of Civil Procedure. Rule 26(a) requires parties to make initial disclosures near the outset of the case. Among other things, each party must provide a copy of documents it might use to support its claims or defenses, as well as "a computation of each category of damages claimed." FED. R. CIV. P. 26(a)(1)(A)(ii)–(iii). But because initial disclosures "may (and often do) prove incomplete" as the

case proceeds, the rules often require supplementation of those disclosures. *Morris v. BNSF Railway Co.*, 969 F.3d 753, 765 (7th Cir. 2020). And so, Rule 26(e) explains that a party that made a disclosure or responded to discovery must "supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1)(A).

In essence, these requirements promote fairness and eliminate surprise. *Colon-Millin v. Sears Roebuck de Puerto Rico*, 455 F.3d 30, 37 (1st Cir. 2006). And Rule 37 gives teeth to these obligations by barring reliance on information that a party failed to properly disclose under Rule 26(a) or Rule 26(e). As Rule 37 explains, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

Loper made her initial disclosures in February 2020. (Doc. 74-3). In that document, Loper said that she suffered "compensatory damages for charges wrongfully billed and/or collected by Defendant, emotional distress damages, attorneys' fees, and costs of litigation." (*Id.* at 4). Then, in an August 2020 discovery

response, Loper listed her damages as including emotional distress, mental anguish, damage to her credit, attorneys' fees and costs, and charges from Lifeguard. (Doc. 74-4 at 16). Then, in her September 2020 amended complaint, Loper alleged that "[a]s a result of Defendant's breaches, Plaintiff and the Class have been damaged by being charged and/or paying excessive prices, accumulating debt, suffering damaged credit, and/or incurring interest and legal costs." (Doc. 43-1 at 18–19).

After all that, Loper testified in a deposition in October 2020. (Doc. 67-4). In it, Loper recalled that she has paid "about $20 or $30 a month" for a credit-monitoring service for the previous three years "to keep on top of [her] credit" and track whether the Lifeguard reported the debt. (*Id.* at 22, 37). And she testified that she "had to hire an attorney to stop the collection process." (*Id.* at 50). But she did not say how much she paid.

The Court held a summary-judgment hearing in July 2021. (Doc. 72). During that hearing, the parties disputed whether Loper suffered a cognizable financial injury. Loper's counsel asserted that her monetary injuries were unlawful billing, the $20–$30 per-month cost of credit monitoring, and a $600 cost of hiring an attorney to challenge Lifeguard's collection effort in December 2017. The next week, Loper served supplemental Rule 26 disclosures. (Doc. 74-1). Those disclosures explained that her damages now include:

1. Credit Monitoring. Loper has incurred costs of at least $20.00 per month for credit monitoring from December 2017 until present. This damage is a total of at least $860.00.

2. Attorneys' Fees. When Lifeguard referred its unlawful, putative debt to a collections agency, United Collections, Loper was compelled to retain counsel to stop that unlawful practice. As a result, Loper incurred $650.00 in charges.

3. Unlawful billing. According to Lifeguard, Loper owes a total of $4,276.15 that was not paid by Blue Cross and Blue Shield of Alabama. Blue Cross and Blue Shield paid a reasonable sum for Loper's transport. The excess charges billed by Lifeguard are unreasonable, and represent a putative debt that is due to be extinguished in this matter.

(*Id.* at 3).

Lifeguard moved to strike Loper's supplemental disclosures and to "disregard the additional damages information." (Doc. 74). In that motion, Lifeguard contends that the Court should strike the supplemental filings and disregard the new "damages information" because Loper violated Rule 26(a) and Rule 26(e). (*Id.* at 19).

The Court enjoys "broad discretion" over discovery matters. *Baker v. Welker*, 438 F. App'x 852, 855 (11th Cir. 2011). As a result, the Court's decision on Lifeguard's motion "is entitled to great deference." *Id.* For the reasons below, the Court grants Lifeguard's motion as to the attorney expenses but denies it as to unlawful billing and credit monitoring.

For starters, Loper did not timely file her supplemental disclosures as Rule 26(e) requires. The Court-imposed deadline for filing "Initial Disclosures" passed on February 12, 2020. (Doc. 35). Although Rule 26(e) often imposes a duty to supplement those disclosures, Loper's doing so was too late. By the time she filed her supplemental disclosures, the discovery deadline had passed (*id.*), the parties had briefed summary judgment, and the Court had held a summary-judgment hearing.

Despite the untimeliness of her post-discovery filing, however, Loper did not violate Rule 26(a) or Rule 26(e) as to unlawful billing and credit monitoring. Rule 26(e) requires the disclosing party to "supplement or correct its disclosure or response" only if both: (1) "the party learns that in some material respect the disclosure or response is incomplete or incorrect"; *and* (2) "the additional or corrective information has not otherwise been made known to the parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1)(A). As the advisory committee's notes make clear, there is "no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process." FED. R. CIV. P. 26 advisory committee's notes to the 1993 amendment; *see also Chadwick v. Bank of Am., N.A.*, 616 F. App'x 944, 948 (11th Cir. 2015) (relying in part on the advisory committee's note).

13

**Unlawful billing**. The parties have known that Loper would rely on her $4,276.15 debt throughout this case. In Loper's initial disclosures, she explained that she sought "compensatory damages for charges wrongfully billed." (Doc. 74-3 at 4). In her amended complaint, she referenced the charge and alleged that she was "damages by being charged and/or paying excessive rates." (Doc. 43-1 at 7, 18). The discovery process also revealed evidence to support the amount of the outstanding debt. (*See, e.g.*, Doc. 67-3 at 88–89, 91). And the parties' statements of undisputed fact agree that the outstanding amount is $4,276.15. (Docs. 55 ¶ 19, 61 ¶ 19). Accordingly, and at the very least, Loper's total bill, her outstanding debt, and her intention to rely on those forms of harm was "made known to the parties during the discovery process." FED. R. CIV. P. 26(e)(1)(A). And Loper therefore had no Rule 26(e) duty to supplement her Initial Disclosures.

**Credit-monitoring service**. Loper testified in her deposition that she had been paying "about $20 or $30 a month" for over three years "to keep on top of [her] credit" and track whether Lifeguard reported the debt. (Doc. 67-4 at 22, 37). Her deposition testimony about the existence and cost of this injury satisfies Rule 26(e) because it made the information "known to the parties during the discovery process." FED. R. CIV. P. 26(e)(1)(A). So she had no Rule 26(e) obligation to supplement.

**Attorney expenses**. Loper did not testify in enough detail to satisfy Rule 26(e) for this injury. In her deposition, Loper claimed that she "had to hire an attorney to stop the collection process." (Doc. 67-4 at 50). But she did not say how much she paid. That information—that she paid about $600—came out for the first time during the summary-judgment hearing when her attorney said it. And Loper has identified no other source of a damage calculation for this injury that satisfies Rule 26(a) or Rule 26(e). True enough, she listed "legal costs" as an injury in her amended complaint (Doc. 43-1 at 7, 19), and listed "Attorneys' Fees and Costs" (without an amount) as an injury in a discovery response (Doc. 74-4 at 16). But she *never* disclosed any "computation . . . of damages" for this injury, as required by Rule 26(a)(1)(A)(ii), and that information never became "known to the parties during the discovery process," which would satisfy Rule 26(e). So her later reliance on this information, without evidentiary support, violates Rule 26. Moreover, the failure to disclose this figure until now—after summary-judgment briefing and discovery deadlines passed—is not "substantially justified" or "harmless" because it prejudiced Lifeguard's summary-judgment arguments. Fed. R. Civ. P. 37(c)(1). So the Court strikes the filings in part and disregards the attorney-expenses information.

\* \* \*

In sum, the Court grants Lifeguard's motion to strike in part and disregard's Loper's reliance on her attorney expenses. She cannot rely on that information to oppose summary judgment. As for the unlawful billing and credit monitoring, Loper complied with Rule 26(a) and Rule 26(e) because that information came out during discovery, which put Lifeguard on notice that Loper might rely on it to support her claims. So even though Loper's supplemental filings that identified those alleged damages were untimely, the Court will not strike them as to that information because the filings were unnecessary and any violation was therefore harmless.

## II.    Lifeguard's Motion for Summary Judgment

The Court analyzes Lifeguard's motion proceeds in two parts. First, it analyzes whether Loper presents a justiciable controversy. Second, it discusses the merits of Loper's claims. For the reasons below, the Court grants Lifeguard's motion in part and denies it in part.

### A. Does Loper present a justiciable controversy?

The Court has a continuing and independent obligation to assure itself of jurisdiction before reaching the merits. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). This case involves two jurisdictional questions: standing and mootness.

16

### 1. Standing

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2. And "an essential and unchanging part of the case-or-controversy requirement of Article III" is that the plaintiff have standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must show "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020).

As the party invoking jurisdiction, Loper bears the burden of proving that she has standing. *Lujan*, 504 U.S. at 561. She cannot do so "in gross," which means that she must "demonstrate standing for each claim [s]he seeks to press and for each form of relief that is sought." *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008) (quotation marks omitted). This inquiry turns on whether Loper "had the requisite stake in the outcome when the suit was filed." *Id.*

One more rule. "[W]hen plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Jacobson*, 974 F.3d at 1245 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). Although plaintiffs do not have to show "that it is literally certain that

the harms they identify will come about," they must do more than make mere "allegations of *possible* future injury." *Clapper*, 568 U.S. at 414 & n.5 (quotation marks and alteration omitted). Thus, they must establish a "material risk," *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 928 (11th Cir. 2020) (en banc), or a "substantial likelihood" of continuing or future injury, *A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1210–11 (11th Cir. 2019).[1] So "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021).

With this framework, the Court explains why Loper has Article III standing for her retrospective claims and *some* prospective claims against Lifeguard.

### a. Injury in fact

1. An injury in fact is a "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for lawsuit in American courts." *Id.* at 2206. For her retrospective breach-of-contract claim, Loper suffered a cognizable injury when she was denied the benefits of her bargain with Lifeguard. That injury

---

[1] As the en banc Eleventh Circuit explained, there is not a meaningful difference between these terms. *Muransky*, 979 F.3d at 927–28 ("We do not see, we should add, a 'material' or 'substantial' difference among these terms, and the Supreme Court has not suggested one.").

materialized when Lifeguard billed Loper (through BlueCross) for $8,166.11 (Docs. 55 ¶ 16, 61 ¶ 16), an amount Loper claims violated the parties' agreement. *See Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012) ("[W]hen a plaintiff generally alleges the existence of a contract, express or implied, and a concomitant breach of that contract, her pleading adequately shows an injury to her rights.").

Lifeguard contends that Loper lacks standing because she never paid any out-of-pocket money for Lifeguard's services. (Docs. 51 at 4, 55 at 12). But case law suggests that Loper's liability for the charge is an injury in fact, no matter if she paid it. Most on point is *DiCarlo v. Saint Mary Hospital*, a class-action challenge to a hospital's rate system, in which the Third Circuit explained:

> At the outset the Court must reject Defendants' argument that Plaintiff's breach of contract claim fails because, not having paid the hospital charges, Plaintiff has suffered no damages. To have standing to assert a breach of contract claim, plaintiffs need not "wait until lawsuits against them were filed or collection agents began harassing them or their credit files were red-flagged." *Puritt v. Allstate Ins. Co.*, 284 Ill. App. 3d 442, 219 Ill. Dec. 845, 672 N.E.2d 353, 356 (1996). The expense is incurred, whether paid or not, at the time the patient enters a hospital with the understanding that he or she is liable for all or part of the charges for the services to be rendered. *Dillione v. Deborah Hosp.*, 113 N.J. Super. 548, 555–56, 274 A.2d 597 (App. Div. 1971).

530 F.3d 255, 263 (3d Cir. 2008). And here, that Lifeguard billed Loper *and* pursued collection efforts is all the more supporting of Article III standing.

More generally, other circuits have held that "a party to a breached contract has a judicially cognizable injury for standing purposes because the other party's breach devalues the services for which the plaintiff contracted and deprives them of the benefit of their bargain." *Mitchell v. Blue Cross Blue Shield of N.D.*, 953 F.3d 529, 536 (8th Cir. 2020) (quotation marks omitted); *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018) ("[The plaintiff] suffered an injury within the meaning of Article III because he was denied health benefits he was allegedly owed under the plan. Like any private contract claim, his injury does not depend on allegation of financial loss. His injury is that he was denied the benefit of his bargain."). Here, too, Lifeguard's alleged breach—overcharging for its services—denied Loper an anticipated benefit of the contract and supports standing. That breach qualifies as an "intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2206; *see Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1120 (Ala. 2003) ("It is well settled that an action will lie for breach of contract, even where the plaintiff has suffered no actual damage.").

Loper's liability for the charge is also a monetary injury that is sufficient for Article III standing. *See TransUnion*, 141 S. Ct. at 2206. Lifeguard's charging Loper for the ambulance transport "placed on [Loper] a definite obligation to pay." *Globe*

*Life Inc. Co. v. Howard*, 147 So. 2d 853, 857 (Ala. Civ. App. 1962). That means Loper incurred the expense when Lifeguard *charged* her, rather than upon payment.

And so, Loper has established an Article III injury as to her retrospective state-law claim for breach of contract.

2. For the prospective claims for declaratory and injunctive relief, the Court finds that Loper has established "a substantial likelihood" of future injury. *A&M Gerber*, 925 F.3d 1210–11. And she therefore presents a cognizable injury for prospective relief. *Jacobson*, 974 F.3d at 1245.

To begin, Lifeguard argues that Loper lacks prospective standing "because there is no reasonably foreseeable possibility that [Loper] will require or receive some future ambulance transport by Lifeguard or incur any future charge by Lifeguard." (Doc. 55 at 16). Those statements are true, but they are not the end of the inquiry. Also relevant is whether the facts reveal a "substantial likelihood" that Loper will face future efforts to collect on the existing debt. *See Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014); *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1348 (11th Cir. 1999). It's a close call, but Loper can show a "substantial likelihood" that she will face future collection efforts.

Three reasons support this decision. First, when she filed her complaint, Loper remained subject to Lifeguard's charge and was at risk of facing more collection

efforts. *See Strickland*, 772 F.3d at 885 (explaining that being "essentially a sitting duck" supported prospective standing). Second, there is no evidence to suggest that Loper is likely, on her own, to "satisfy the[] outstanding debt[]." *Id.* And third, Lifeguard's previous efforts to collect the debt from Loper suggested that, without judicial intervention, Lifeguard would try to collect from Loper again.

On the third point, the Supreme Court has made clear that "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). From April to December 2017, Lifeguard tried to collect on its own and through a collection agency. It is true that Lifeguard did not pursue collection after December 2017, but Lifeguard's attorney conceded during the summary-judgment hearing that Lifeguard "discontinued its collection efforts" because it "decided it wanted to avoid litigation." Given that fact, plus Lifeguard's consistent denial of wrongdoing and resolve that its rates are reasonable, the Court finds that the only thing that might insulate Loper from future collection efforts was filing this lawsuit. Further, any contingencies that exist here are far less speculative and attenuated than those that existed in *O'Shea*, 414 U.S. at 496–97, or *City of Los Angeles v. Lyons*, 461 U.S. 95, 106–07 (1983). And so, Loper has established a "substantial likelihood" of future injury sufficient for prospective standing. *A&M Gerber*, 925 F.3d 1210–11.

The Court recognizes that the "voluntary cessation" doctrine—which the Court discusses later when judging mootness—doesn't apply to standing. *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1189 n.16 (11th Cir. 2007). Even so, the 15-month hiatus between Lifeguard's most recent collection effort and the filing of this lawsuit does not preclude prospective standing. Lifeguard pursued collection efforts on its own and then hired a collection agency to pursue the debt. Lifeguard stopped coming after Loper in December 2017, but only after she threatened a class-action lawsuit. And Lifeguard's counsel admitted at the hearing that Lifeguard stopped collection efforts only because it wanted to avoid litigation. Lifeguard then conceded in a later filing that it has not ceased charging its commercial rates (Doc. 73 at 8), which implies that it generally has not ceased pursuing its debts, either. From Loper's perspective, Lifeguard was lying in wait—waiting for the chance to pursue its debt. And at some point, she had to make good on her threat to sue, or otherwise face the non-speculative "substantial likelihood" that she would face Lifeguard's collection efforts once again. *See Strickland*, 772 F.3d at 883. That's enough for prospective standing.

### b. *Causation and Redressability*

Loper satisfies the causation and redressability components of standing for her breach-of-contract claim. For her prospective claims, Loper satisfies causation

and redressability for part of declaration request (e) and for her second injunction request. For the other prospective claims, she cannot satisfy redressability.

1. For causation, Loper must establish "that the injury was caused by the defendant." *Thole*, 140 S. Ct. at 1618. She alleges that Lifeguard breached their agreement by excessively billing her. That injury—deprivation of the benefit of her bargain—is traceable to Lifeguard.

2. For redressability, Loper must show that her "injury would likely be redressed by the requested judicial relief." *Id.* And Loper must show standing "for each form of relief that is sought." *Davis*, 554 U.S. at 734 (quotation marks omitted).

So, as for her breach of contract claim, a favorable judgment would redress her charge-liability injury because it would answer whether Lifeguard's decision to charge Loper $8,166.11 violated their agreement. (Docs. 55 ¶ 16, 61 ¶ 16).

For Loper's prospective claims, the Court must determine which of her prospective remedies would redress her charge-liability injury; that is, her future injury of Lifeguard trying to collect on her unpaid debt. Loper asks for six declarations and two injunctions. (Doc. 43-1 at 14–15). The Court finds that only part of declaration request (e)[2] and her second injunction request[3] would redress her

---

[2] Declaration (e) provides: "that Defendant ha[s] no legally enforceable right to charge and/or collect the prices charges in any court proceeding or other collection effort, and Plaintiff and the Class have no legal obligation to pay Defendant the prices charged by Defendant for the transportation of patients." (Doc. 43-1 at 14).

[3] Her second injunction request would order Lifeguard to quit its "attempts to collect outstanding bills representative

feared future injury. Loper can pursue prospective remedies that would confront Lifeguard's right to *collect* on her already-imposed charge. But she cannot pursue a remedy that would challenge the amounts that Lifeguard may *charge* because there is no indication that Loper will incur another charge or require another ambulance transport. Thus, she can pursue declaration request (e) to the extent that it would define Lifeguard's "right to . . . collect the prices charged" and Loper's obligation to pay that amount, and she can pursue her second injunction, but no more. The other part of declaration request (e) and the first injunction request would redress an injury that Loper will not suffer. And the other declarations requests—(a), (b), (c), (d), and (f)—would redress nothing at all. So she lacks standing to pursue those remedies.

Finally, Loper also asks for "disgorgement . . . of all excessive sums collected." (Doc. 43-1 at 15). In her prayer for relief, she requests for a "constructive trust" for these amount. (*Id.* at 19). "Disgorgement in an equitable remedy intended to prevent unjust enrichment." *SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017) (quotation marks and citation omitted). But the undisputed facts show that Loper paid nothing out-of-pocket for Lifeguard's charges. So there is no collection to recover, and she lacks standing to pursue these equitable remedies.

---

of excessive rates for which no express agreement as to price exists." (Doc. 43-1 at 15).

In sum, Loper has Article III standing to pursue retrospective relief for breach of contract, and the prospective relief of the part of declaration (e) pertaining to Lifeguard's right to collect charged amounts and her second injunction request.

### 2.  Mootness

Standing is not perpetual. A case becomes moot—meaning that it is no longer a "Case" or "Controversy" under Article III—if intervening circumstances have "irrevocably eradicated the effects of the alleged violation." *City of Los Angeles*, 461 U.S. at 101. At that point, the case "no longer presents a live controversy with respect to which the court can give meaningful relief." *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1355 (11th Cir. 2019). And if a case becomes moot "at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–78 (1990)).

Lifeguard argues that three things moot this case. First, that a 3-year statute of limitations bars Lifeguard from pursuing Loper's debt. (Doc. 71 at 16–17). Second, that its failure to assert a compulsory counterclaim bars it from trying to collect now and later. (*Id.* at 17–18). And third, that it has not contacted Loper or otherwise tried to collect since December 2017 (*id.* at 15) and has no intention to pursue future collection (*id.* at 16 n.7). But none of these moots this case.

### *a.  The statute of limitations*

According to Lifeguard, its claim to Loper's debt is an "open account" claim subject to a 3-year statute of limitations under Section 6-2-37 of the Alabama Code. Lifeguard argues that its claim accrued in April 2017 at the latest, that the 3-year limitations period has run, and that it is now legally barred from pursuing the unpaid balance of its charge. The Court disagrees.

This issue boils down to whether a 3-year or 6-year limitation applies. The Alabama Legislature enacted a 6-year statute of limitations for "[a]ctions upon any simple contract." ALA. CODE § 6-2-34(9). By contrast, the Legislature created a 3-year statute of limitations for "[a]ctions to recover money due by open or unliquidated account." *Id.* § 6-2-37(1). In a few cases, Alabama courts have applied the open-account statute of limitations in actions that involved implied contracts. *See Norton v. Liddell*, 194 So. 2d 514, 518 (Ala. 1967); *White v. Sikes, Kelly, Edwards and Bryant, P.C.*, 410 So. 2d 66, 69 (Ala. Civ. App. 1982) ("It is established that damages for the reasonable value of services rendered under an implied contract, the terms of which were not fixed by the parties, is merely an open account. Suit thereon is subject to be barred after three years under the provisions of § 6-2-37, Code (1975)."). From these cases, Lifeguard argues that it cannot pursue Loper's debt because the 3-year period has run and that this case is moot.

Lifeguard is correct that it cannot sue Loper for an open-account claim. ALA. CODE 6-2-37. But "a claim to collect on an open account is not mutually exclusive of other claims such as breach of contract." *Brown v. Encore Capital Grp., Inc.*, No. 2:14-cv-1152, 2015 WL 1778380, at *7 (N.D. Ala. Apr. 20, 2015) (citing *Stacey v. Peed*, 142 So. 3d 529, 530 (Ala. 2013)). Lifeguard can still sue Loper for breach of contract. And because the 6-year statute of limitations for that claim has not run, ALA. CODE § 6-2-34(9), this case is not moot because of a statute of limitation.

### b. *Compulsory counterclaims*

Next, Lifeguard argues that its failure to assert a compulsory counterclaim in its first responsive pleading bars it from pursuing Loper's debt and moots this case. True enough, Lifeguard's claim for the unpaid balance of the ambulance-transport charge is a compulsory counterclaim. *See* FED. R. CIV. P. 13(a). But Lifeguard could ask for leave to amend its answer and add a counterclaim for breach of contract. *See* FED. R. CIV. P. 15(a). So Lifeguard's failure to assert a counterclaim does not moot this case, either.[4]

---

[4] Lifeguard might complain that the Court would not *grant* leave to amend its answer after the close of discovery and briefing on summary judgment, so Lifeguard's ability to seek leave is illusory. But even if that's true, invoking the compulsory-counterclaim rule to rule that this case is moot would not bar Lifeguard from bringing a breach-of-contract claim because there would be no final judgment on the merits or actual litigation of these issues. Alabama law controls our claim-preclusion and issue-preclusion analyses. *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001); *CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1338 (11th Cir. 2017). And under Alabama law, if the Court terminated this suit for a non-merits reasons or before adjudication of the contract issues, then neither form of preclusion would bar Lifeguard from suing Loper for breach of contract. *See Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 489 (Ala. 2020) (explaining that claim preclusion requires "a prior judgment on the merits"); *Aliant Bank v. Four Star Investments, Inc.*, 244 So. 3d 896, 911 (Ala. 2017) (explaining that issue preclusion bars "relitigation of

### c. Voluntary cessation of the offensive conduct

Lifeguard's final argument is that this case is moot because it is no longer pursuing Loper's debt and has no intention to pursue collection going forward. (Doc. 71 at 16, 73 at 6–10). Lifeguard explains that it has not pursued collection since December 2017 (Doc. 73 at 5), and that it is even "willing to give [Loper] a release to evidence that [Lifeguard] has no intention to pursue any future collection action against her," (Doc. 71 at 16 n.7). But these circumstances do not moot this case.

One initial matter—Lifeguard argues that these facts reflect a lack of standing because Lifeguard ceased the offensive conduct before Loper sued. (Doc. 73 at 6). As the Court explained above, though, Loper has standing because there remains a "substantial likelihood" that, without this suit, she will again face collection efforts. *See Strickland*, 772 F.3d at 883. Another initial matter—Lifeguard's offer to give Loper a release does not moot this case, either. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165 (2016) ("In sum, an unaccepted settlement offer or offer of judgment does not moot a plaintiff's case . . . .").

And now to the heart of the matter: Lifeguard's promise not to pursue collection against Loper going forward does not moot this case because of the "voluntary cessation" doctrine. The Supreme Court has explained "that a defendant

---

issues actually litigated"). So application of Rule 13(a) cannot eliminate Lifeguard's ability to seek collection.

cannot automatically moot a case simply by ending its unlawful conduct once sued."
*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.* As a result, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

In *Sheely v. MRI Radiology Network, P.A.*, the Eleventh Circuit set out three relevant factors for voluntary-cessation analysis. 505 F.3d 1173, 1184 (11th Cir. 2005). First, courts should ask "whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice." *Id.* Second, courts should consider "whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit." *Id.* And third, courts should look at "whether, in ceasing the conduct, the defendant has acknowledged liability." *Id.* Balancing these factors, Lifeguard cannot show "that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. at 190.

For the first factor, courts "are more likely to find a reasonable expectation of recurrence when the challenged behavior constituted a 'continuing practice' or was otherwise deliberate." *Sheely*, 505 F.3d at 1184–85. Lifeguard acknowledges that it has not ceased applying its commercial rates for ambulance transports. (Doc. 73 at 8). And it agreed that its charge system is "neither isolated nor unintentional." (*Id.* at 7). Thus, this factor weighs against mootness.

For the second factor, courts "are more likely to find that cessation moots a case when cessation is motivated by a defendant's genuine change of heart rather than his desire to avoid liability." *Sheely*, 505 F.3d at 1186. At the summary-judgment hearing, Lifeguard's counsel admitted that Lifeguard, "in discontinuing its collection efforts" against Loper in December 2017, was "concerned [and] decided it wanted to avoid litigation." So Lifeguard's timed its cessation of collection efforts to avoid litigation. This factor therefore goes against mootness, too.

And for the third factor, "a defendant's failure to acknowledge wrongdoing similarly suggests that cessation is motivated merely by a desire to avoid liability, and furthermore ensures that a live dispute between the parties remains." *Id.* at 1187. Lifeguard's position is that there is no "impropriety related to the rates [it] charges" and no "basis for Lifeguard to acknowledge liability." (Doc. 73 at 8). Once again, this factor invariably weighs against mootness. And, on balance, the voluntary-

cessation doctrine prevents mootness.

Lifeguard has not pursued collection against Loper since December 2017. But Lifeguard's counsel admitted that it ceased doing so to avoid litigation, shortly after Loper hired an attorney. And Lifeguard has confidently acknowledged that it continues to apply the commercial rates that are the subject of this lawsuit for other ambulance passengers. For those reasons, this case is not moot. The Court will now proceed to the merits.

## B. Are there questions of fact for the jury to decide?

Loper brought claims for breach of contract, declaratory judgment (and injunctive relief), fraudulent suppression, and negligent misrepresentation. (Doc. 43-1 at 12–19). The Court will address her claims in that order.

### 1. Breach of Contract

To prevail on a claim for breach of contract, Loper must prove: (1) the existence of a valid and enforceable contract binding the parties; (2) her own performance; (3) Lifeguard's nonperformance; and (4) resulting damages. *State Farm Fire & Cas. Co. v. Williams*, 926 So. 2d 1008, 1013 (Ala. 2005).

There are three kinds of contracts in Alabama. The first is an express contract, such as a written agreement, which requires "an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract."

*Ex parte Jackson Cnty. Bd. of Educ.*, 4 So. 3d 1099, 1103 (Ala. 2008) (quoting *Ex parte Grant*, 711 So. 2d 464, 465 (Ala. 1997)). The second is an implied-in-fact contract, which "requires the same elements as an express contract, and differs only in the 'method of expressing mutual assent.'" *Id.* at 1104 (quoting *Ellis v. City of Birmingham*, 576 So. 2d 156, 157 (Ala. 1991)). Contracts implied in fact "normally arise in situations where there is a bargained-for exchange contemplated by the parties, but no overt expression of agreement." *Id.* (quoting *Ellis*, 576 So. 2d at 157); *see also Radiology Assocs., P.A. v. St. Clair Timber Co.*, 563 So. 2d 1020, 1021 (Ala. 1990) ("An implied-in-fact contract may be found from circumstances showing that a mutual agreement had been reached."). And the third are implied-in-law contracts, which "are more properly described as quasi or constructive contracts where the law fictitiously supplies the promise to prevent a manifest injustice or unjust enrichment, etc." *Green v. Hosp. Bldg. Auth.*, 318 So. 2d 701, 704 (Ala. 1975). Implied-in-law contract are legal fictions "created by the law for reasons of justice." 1 CORBIN ON CONTRACTS § 1:20 (2021).

Lifeguard contends that the parties entered an express agreement that committed Loper to pay Lifeguard's standard commercial rates. (Doc. 55 at 25). In the alternative, Lifeguard says that Loper agreed to pay Lifeguard's standard rates under any implied-in-fact agreement. (Doc. 71 at 21–22). And Lifeguard argues that

Loper's claim fails because Loper didn't suffer any actual damages. (Doc. 55 at 29).

Loper, by contrast, argues that the price term in the Acknowledgment Form is too indefinite to enforce. (Doc. 61 at 29–30). Her view is that the parties entered an implied-in-fact contract without a price term. (*Id.* at 20–21). This means that the contract contained an open, undefined, or missing price term, and the law therefore implies a promise to pay the reasonable value of the service. (*Id.* at 17, 22–23). And Lifeguard breached that contract by charging more than the reasonable value.

### a. The terms of the agreement

The parties agree that an enforceable contract exists between Loper and Lifeguard. But they dispute whether the express price term in the Acknowledgment Form is enforceable and, in the alternative, what term the Court should enforce under an implied-in-fact contract.

1. The Court begins with the Acknowledgment Form. The question is whether the price term is void for indefiniteness. If it is, then the term is a legal nullity. If it's not, Loper must pay Lifeguard's full charge. Whether the price term fails for indefiniteness is a question of law. *White Sands Grp., L.L.C. v. PRS II, LLC*, 998 So. 2d 1042, 1052 (Ala. 2008).

"To be enforceable, the essential terms of a contract must be sufficiently definite and certain, and a contract that leaves material portions open for future

agreement is nugatory and void for indefiniteness." *Id.* at 1051 (cleaned up). A contract can lack definiteness in "the time of performance, *the price to be paid*, work to be done, property to be transferred, or miscellaneous stipulations in the agreement." *Id.* (emphasis added). "In particular, a reservation in either party of a future unbridled *right to determine the nature of performance* . . . has often caused a promise to be too indefinite for enforcement." *Id.*

"The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* (emphasis omitted). "Additionally, in order for an alleged contract to be considered void based on the indefiniteness of its terms, the indefiniteness must reach the point where construction becomes futile." *Poole v. Prince*, 61 So. 3d 258, 275 (Ala. 2010) (cleaned up). "A court will, if possible, interpret doubtful agreements by attaching a sufficiently definite meaning to a bargain if the parties evidently intended to enter into a binding contract." *Id.*

And when interpreting a contract, "[w]here there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning." *Once Upon a Time, LLC v. Chappelle Properties, LLC*, 209 So. 3d 1094, 1097 (Ala. 2016) (quoting *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000)).

The price term in the Acknowledgment Form says that Loper "is financially responsible for, and obligated to pay, the amount charged by [Lifeguard] for the medical services, including any amount that is not paid by any third-party payor." (Docs. 55 ¶ 15, 61 ¶ 15, 67-2 at 242). The form did not set out any amount that Lifeguard would charge or that Loper would pay. Nor did it reference Lifeguard's rate structure. Rather, by its "plain, ordinary, and natural meaning," *Once Upon a Time, LLC*, 209 So. 3d at 1097, the price term would require Loper to pay **any** amount that Lifeguard decided to charge. That term is too indefinite to enforce because it gives Lifeguard "a future unbridled *right to determine the nature of the performance*." *White Sands Grp., L.L.C.*, 998 So. 2d at 1051.

In arguing otherwise, Lifeguard relies only on cases involving hospital-admission contracts. But "the peculiar circumstances of hospitals" distinguish those cases. *DiCarlo*, 530 F.3d at 263; *see also Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 311 (Ind. 2012) ("We align ourselves with those courts that have recognized the uniqueness of the market for health care services delivered by hospitals . . . .").

As an example, consider the Third Circuit's decision in *DiCarlo*. In that case, an uninsured plaintiff brought a class action against a hospital (and other healthcare providers) after the hospital charged the plaintiff "in accordance with a hospital

index of prices." *DiCarlo*, 530 F.3d at 262. At the time of his admission to the hospital, the plaintiff signed a document that "guarantee[d] payment of all charges and collection expenses for services rendered." *Id.* at 261. For his breach-of-contract claim, the plaintiff argued that the admission contract "contained an open price term and that, therefore, the law implies an agreement to pay only a reasonable price." *Id.* at 263. But the district court and Third Circuit rejected that argument. *Id.* at 263–64. And "the peculiar circumstances of hospitals" formed the foundation of the court's decision. *Id.* at 263.

The *DiCarlo* court held that the term "all charges" was definite enough to enforce because it "unambiguously can only refer to St. Mary's uniform charges set forth in its Chargemaster." *Id.* at 264. As the court explained:

> The price term "all charges" is certainly less precise than price term of the ordinary contract for goods or services in that it does not specify an exact amount to be paid. It is, however, **the only practical way** in which the obligations of the patient to pay can be set forth, given the fact that nobody yet knows just what condition the patient has, and what treatments will be necessary to remedy what ails him or her. Besides handing the patient an inches-high stack of papers detailing the hospital's charges for each and every conceivable service, which he or she could not possibly read and understand before agreeing to treatment, the form contract employed by St. Mary's is **the only way** to communicate to a patient the nature of his or her financial obligations to the hospital. Furthermore, "it is incongruous to assert that [a hospital] breached the contract by fully performing its obligation to provide medical treatment to the plaintiff[] and then sending [him] [an] invoice[] for charges not covered by insurance." *Burton v. William*

*Beaumont Hosp.*, 373 F. Supp. 2d 707, 719 (E.D. Mich. 2005).

*Id.* (emphasis added) (footnote omitted). And so, the court held that the promise to pay "all charges" was enforceable and upheld the dismissal of the plaintiff's contract claim. *Id.* at 264, 267.

Other courts have similarly recognized that the special circumstances of hospital healthcare support the enforcement of less-than-precise price terms in admissions contracts. *See, e.g.*, *Centura Health Corp. v. French*, 490 P.3d 780, 786 (Colo. Ct. App. 2020) ("[H]ospitals cannot always accurately predict what services a patient will ultimately require."); *Allen*, 980 N.E.2d at 311 ("We align ourselves with those courts that have recognized the uniqueness of the market for health care services delivered by hospitals . . . ."); *Shelton v. Duke Univ. Health Sys., Inc.*, 633 S.E.2d 113, 124 (N.C. Ct. App. 2006) ("[I]t would be impossible for a hospital to fully and accurately estimate all of the treatments and costs for every patient before treatment has begun."). And in the Court's view, those cases suggest that such vague contract terms would be unenforceable outside the special context of hospitals.

Lifeguard contends that this ambulance-transport case is identical to the hospital-admission cases. (Doc. 55 at 27–29). And according to Lifeguard, "it would be extremely difficult to precisely define and set out the specific rate terms in the agreement Lifeguard clients, like [Loper], are asked to sign because of the variance

in circumstances between transports which cannot be known pre-transport." (*Id.* at 29). But this argument ignores the fact that, when the "Out-of-Town Transport Policy" applies, Lifeguard estimates the cost and discloses that cost to the passenger before transport. (Docs. 55 ¶ 7, 61 ¶ 7). Counsel told the Court at the hearing that Lifeguard would have given Loper a pre-transport disclosure of the cost if her transport happened on a weekday, rather than over the weekend. So at least some disclosure of the cost was possible. And Lifeguard's argument that its cost variations parallel those that existed in the hospital cases does not persuade the Court.

As a result, the Court finds that the hospital-admission-contract cases are not persuasive. Unlike *DiCarlo*, Lifeguard's use of the contract term "the amount charged" (Doc. 55 ¶ 15) is not "the only practical way" to inform the passenger of her obligations. 530 F.3d at 264. Rather, consistent with the Alabama Supreme Court's guidance, the Court finds that the price term signed by Loper was indefinite and unenforceable because it gives Lifeguard an "unbridled *right to determine the nature of the performance*." *White Sands Grp., L.L.C.*, 998 So. 2d at 1051. The Court will not inject an interpretation that contradicts the plain and ordinary meaning of the price term. So there is no enforceable express contract term over the price Loper must pay for Lifeguard's services.

2. The Court turns now to the terms of the parties' implied-in-fact agreement. An implied-in-fact contract "requires the same elements as an express contract, and differs only in the 'method of expressing mutual assent.'" *Ex Parte Jackson Cnty.*, 4 So. 3d at 1104 (quoting *Ellis*, 576 So. 2d at 157). That form of contract "arises where there are circumstances which, according to the ordinary course of dealing and common understanding, show a mutual intent to contract." *Util. Bd. v. Shuler Bros., Inc.*, 138 So. 3d 287, 294 (Ala. 2013). And it usually results from situations when "there is a bargained-for exchange contemplated by the parties, but no overt expression of agreement." *Ex Parte Jackson Cnty.*, 4 So. 3d at 1104 (quoting *Ellis*, 576 So. 2d at 157).

The parties agree that an implied-in-fact contract existed between Loper and Lifeguard. (Docs. 78-1 at 4, 79 at 3). And there is a genuine dispute of material fact as to the agreed-upon price. For example, a reasonable jury could find that Loper intended only to pay the amount BlueCross was willing to cover (Doc. 78 at 3), or that she intended to pay Lifeguard's standard rates (Doc. 71 at 21–22). It is for a jury to determine whether Loper impliedly acquiesced to pay Lifeguard's standard rates. But under Loper's view of the facts, the parties never reached an implied agreement as to the price for Lifeguard's services.

In an implied-in-fact contract, a lack of agreement as to price is not fatal to the agreement. *Autauga Creek Craft House, LLC v. Brust*, 315 So. 3d 614, 629 (Ala. Civ. App. 2020). Rather, in such cases, "the law implies a promise on the part of the one accepting with knowledge the services rendered by another to pay the reasonable value of such services rendered." *Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006) (citation omitted). That is recovery on a quantum-meruit basis. *Id.*

Contract-formation questions, such as whether the parties agreed on an essential term, are fact questions for a jury. *See Kennedy v. Polar*, 682 So. 2d 443, 447 (Ala. 1996). Likewise, whether the price Lifeguard charged represented the "reasonable value" of its services is a question of fact for the jury. *See Autauga*, 315 So. 3d at 629 (construing question of whether the plaintiff was "fully compensated" as a fact question). And a reasonable jury could find that Lifeguard's charged price was excessive based on, as examples, Loper's and Murray's testimonies (Docs. 67-3 at 61, 67-4 at 38–39) and the percentage of transactions for which Lifeguard receives the amount it bills (*see*, *e.g.*, Docs. 67-2 at 139–40, 150–51). *See Ex parte Univ. of S. Ala.*, 737 So. 2d 1049, 1053 (Ala. 1999) (explaining that a hospital employee's testimony that charges were reasonable was enough to support a fact finding). Of course, other factors might influence a jury to conclude that the charged

price was reasonable. But the Court will not grant summary judgment on this basis.[5]

### b.   Contract Damages

Lifeguard next contends that Loper's claim must fail for a lack of damages because Loper has "paid nothing out-of-pocket for her Lifeguard transport" (Doc. 55 at 29–30). Only BlueCross has paid Lifeguard any money for Loper's transport. (*Id.*).

One element of a breach-of-contract claim is "resulting damages." *State Farm Fire & Cas. Co.*, 926 So. 2d at 1013. The Alabama Supreme Court has upheld judgment against a plaintiff where there was enough evidence for the trial court to conclude that the plaintiff "suffered no damage." *Dupree*, 308 So. 3d at 491. It has also reversed a damage judgment for plaintiffs who presented no competent evidence of their damages. *State Farm Fire & Cas. Co.*, 926 So. 2d at 1016–18. By contrast, the Alabama Supreme Court has also explained that "an action based on a breach of contract will lie even where the plaintiff has suffered no actual damage." *RLI Ins. Co. v. MLK Ave. Redevelopment Corp.*, 925 So. 2d 914, 918 (Ala. 2005). In

---

[5] Throughout this litigation, Loper's contract theory has been that, in the absence of mutual assent as to price, the law implies a promise to pay the reasonable value of the service. (*See* Doc. 55 at 17 ("The undisputed record reflects that the parties never agreed on a price for Defendant's ambulance services."); *id.* at 19 ("[T]here was admittedly no mutual assent regarding the cost of Defendant's transport services."); *id.* at 23 ("[T]here was no agreement as to the price of Defendant's services."). Then, in response to a follow up question from the Court, Loper suggested that the parties *impliedly* agreed that the price would be the amount BlueCross was willing to cover. (Doc. 78 at 3–4). But not only does this supplemental argument contradict Loper's earlier statements that there was never a meeting of the minds as to price, there is also no evidentiary support that Lifeguard impliedly agreed to accept less than its commercial rate. Indeed, Lifeguard even hired a collection agency to pursue the full amount of the charge up until December 2017. For those two reasons, the Court will not consider Loper's alternative (and late-pressed) argument any further.

such cases, the plaintiff "is entitled to at least nominal damages." *Id.* (quoting *Avis Rent A Car*, 876 So. 2d at 1120).

BlueCross paid $3,889.96 of the charge on Loper's behalf, and the rest remains unpaid. (Doc. 67-3 at 88). And there is no record evidence that Loper made an out-of-pocket payment or that her insurance rates went up as a result. But she *did* present evidence that she has paid "around $20 or $30 a month" for a credit-monitoring service (Doc. 67-4 at 22, 37), which her counsel says reaches a total cost "of at least $860.00," (Doc. 74-1 at 3). And although there is a colorable argument that this injury is not recoverable because it is not "the natural and proximate consequence[] of the breach," *Deupree v. Butner*, 522 So. 2d 242, 248 (Ala. 1988), that argument is not before the Court.

The question is whether Loper has a viable breach-of-contract claim despite having paid money to Lifeguard. Under Alabama law, the answer is 'yes' because, even if Loper suffered no damage, she can proceed for nominal damages. *RLI Ins. Co.*, 925 So. 2d at 918.[6]   So the Court will not grant summary judgment on this basis.

---

[6] In her amended complaint, Loper asked for compensatory and punitive damages in her amended complaint but did not request nominal damages. (Doc. 43-1 at 19). She did, however, ask for "such further relief as the Court deems just." (*Id.*). The Court finds that this language is enough to encompass an alternative request for nominal damages.

\* \* \*

In sum, questions of fact exist about the parties' implied-in-fact agreement and the reasonableness of Lifeguard's charge. So Loper's failure to pay that amount (to date) does not preclude that question from going to the jury. The Court thus denies summary judgment on breach of contract.

## 2. *Declaratory and injunctive relief*

Lifeguard presses several arguments against prospective relief. In its initial brief, Lifeguard focused its arguments on the improbability of Loper and Lifeguard interacting in the future. (Doc. 55 at 14–17). In its reply brief, Lifeguard added that the Court cannot issue a declaratory judgment that adjudicates past behavior (Doc. 71 at 11–15) and that declarations that are "merely duplicative of a breach of contract claim" must also be dismissed. (Doc. 71 at 14).[7]

"It is well established that district courts have exceptionally broad discretion in deciding whether to issue a declaratory judgment, and the remedy is not obligatory." *Otwell v. Ala. Power Co.*, 747 F.3d 1275, 1280 (11th Cir. 2014) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–88 (1995)). And in deciding whether

---

[7] "[I]t is improper for a litigant to raise new arguments in a reply brief." *Sellers v. Nationwide Mut. Fire Ins. Co.*, No. 2:15-cv-957, 2016 WL 5390564, at \*6 (N.D. Ala. Sept. 27, 2016). But these arguments simply build on Lifeguard's initial argument that declaratory judgments and injunctions regulate *future* conduct, not past conduct. (Doc. 55 at 11–17). Given that, plus the Court's broad discretion in the context of prospective relief, the Court will consider Lifeguard's reply-brief arguments here.

to issue a declaratory judgment, courts must "yield[] to considerations of practicality and wise judicial administration." *Wilton*, 515 U.S. at 288.

There are several reasons *not* to issue a declaratory judgment. One is that "[a] declaratory judgment is inappropriate solely to adjudicate past conduct." *Del. State Univ. Student Hous. Found. v. Ambling Mgmt. Co.*, 556 F. Supp. 2d 367, 374 (D. Del. 2008); *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 494 (E.D. Va. 2002). Another is that declaratory judgments are improper where the issue falls within the scope of another claim in the case. *See, e.g.*, *Organo Gold Int'l Inc. v. Aussie Rules Marine Servs., Ltd.*, 416 F. Supp. 3d 1369, 1375–76 (S.D. Fla. 2019); *HM Peachtree Corners I, LLC v. Panolam Indus. Int'l, Inc.*, No. 1:17-cv-1000, 2017 WL 3700304, at *3 (N.D. Ga. Aug. 28, 2017) ("It is common in our Circuit for District Courts to dismiss requests for declaratory judgment when a plaintiff asserts a corresponding claim for breach of contract.").

Of Loper's six declaratory-judgment requests, she only has standing to pursue the part of request (e) related to Lifeguard's right to collect and Loper's obligation to pay previously charged amounts. (Doc. 43-1 at 14). The Court will allow request (e) to continue because it would adjudicate Lifeguard's right to pursue collection from Loper in the future. And it neither adjudicates past conduct nor is duplicative of her breach-of-claim. The Court will issue such a declaration—in sufficiently

45

specific form—if Loper prevails at trial.

Loper also seeks two injunctions. The first would require Lifeguard to "cease charging excessive rates for the transporting of patients without an express agreement." (*Id.* at 15).[8]  The second would order Lifeguard to "cease [its] attempts to collect outstanding bills representative of excessive rates for which no express agreement as to price exists." (*Id.*). Lifeguard's only argument against injunctive relief is that Loper lacks prospective standing. But because the Court has already rejected that argument, the second injunctive-relief request survives summary judgment.

### 3.  *Loper's tort claims*

Finally, Loper brought claims for fraudulent suppression and negligent misrepresentation. (Doc. 43-1 at 16–17). Lifeguard asks for summary judgment on those claims. (Doc. 51 at 6–10). And Loper did not oppose summary judgment in her briefing. So the Court grants Lifeguard's motion as to those claims.

---

[8]  But Loper lacks standing to pursue this injunction.

\* \* \*

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Lifeguard's motion to strike and disregard. (Doc. 74).

The Court **GRANTS IN PART** and **DENIES IN PART** Lifeguard's motion for summary judgment. (Doc. 51). The Court will enter a separate order that dismisses the claims for which the Court grants Lifeguard's motion.

**DONE** and **ORDERED** on September 29, 2021.

_____
  **COREY L. MAZE**
  UNITED STATES DISTRICT JUDGE